# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| CHURCHILL DOWNS INCORPORATED, | |
| Plaintiff, | CIVIL ACTION FILE |
| vs. | NO. 1:12-CV-517 JEC |
| COMMEMORATIVE DERBY PROMOTIONS, INC., and LEONARD LUSKY, | |
| Defendants. | |

**MEMORANDUM OF AUTHORITY
IN SUPPORT OF CHURCHILL DOWNS
MOTION FOR PRELIMINARY INJUNCTION**

\* \* \* \* \* \* \* \*

Plaintiff, Churchill Downs Incorporated, by counsel, hereby submits this

Memorandum of Authority in support of its Motion for Preliminary Injunction.

**TABLE OF CONTENTS**

**Page**

I.     THE PLAINTIFF ...................................................................... 1

II.    THE CLAIMS GENERALLY AND PROPRIETY OF GEORGIA
       VENUE ................................................................................ 2

III.   ADDITIONAL FACTUAL BACKGROUND ............................................. 4

IV.    ARGUMENT ........................................................................... 7

       A.     PUBLIC POLICY ............................................................... 7

       B.     REFUSAL BY FORMER LICENSEE TO CEASE
              COMMERCIALIZATION OF  CHURCHILL DOWNS
              INSIGNIA ...................................................................... 7

       C.     CONTRACTUAL STIPULATION TO INJUNCTION .................... 8

       D.     PRELIMINARY INJUNCTION STANDARD ................................. 9

              (i)     "Substantial Likelihood Of Success On The Merits" ............ 10

                      (1)     Trademark Infringement and Unfair Competition
                              Generally.................................................. 12

                      (2)     The Test of Trademark Infringement and Unfair
                              Competition................................................ 14

                      (3)     Intent of Defendants to Misappropriate Churchill
                              Downs Good Will........................................... 15

                      (4)     Distinctiveness of the Marks At Issue.......................... 17

                      (5)     Similarity Of The Marks............................... 18

                      (6)     Similarity of Products, Trade Channels &
                              Advertising Methods .................................... 22

                      (7)     Actual Confusion....................................... 23

## TABLE OF CONTENTS
(continued)

**Page**

      (ii)    "Irreparable Harm" ................................................................... 24

      (iii)   "Threatened Injury To The Trademark Owner
             Outweighs Whatever Damage The Injunction May
             Cause The Alleged Infringer" ................................................ 24

      (iv)   "Injunction, If Issued, Would Not Be Adverse To The
             Public Interest" ..................................................................... 24

V.     CONCLUSION ........................................................................... 25

<u>**TABLE OF AUTHORITIES**</u>

**Page**

**CASES**

*Ackerman Sec. Sys. v. Design Sec. Sys.*, 201 Ga. App. 805 (1991)..................15, 23

*AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531 (11th Cir. 1986)...................................15

*Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252 (5th Cir. 1980).............16, 23

*Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496 (5th Cir. 1979)...........18

*Atlanta Paper Co. v. Jacksonville Paper Co.,* 184 Ga. 205 (1937).......................12

*Bd. of Regents v. Buzas Baseball, Inc.*, 176 F.Supp.2d 1338 (N.D. Ga.
    2001)...........................................................................................................12, 18

*Bd. of Supervisors of La. State Univ. v. Smack Apparel Co.,* 550 F.3d 465 (5th Cir.
    2008), *cert. denied*, 129 S.Ct. 2759 (2009)....................................4, 5, 20, 21, 22

*Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22 (1st Cir. 1989)..........4, 5, 13, 14, 20

*Boston Prof'l Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc*., 510 F.2d
    1004 (5th Cir. 1975)...........................................................................12, 14, 18, 23

*Burger King Corp. v. Mason*, 710 F.2d 1480 (11th Cir. 1983)...............................8

*Churchill Downs Distilling Co. v. Churchill Downs, Inc.*, 262 Ky. 567
    (1936) ......................................................................................... 1, 2, 13, 17

*Davidoff & Cie, SA v. Lancaster Group US LLC*, 263 F.3d 1297 (11th Cir.
    2001).................................................................................................7, 10, 24

*Dunkin' Donuts Franchised Rests. LLC v. Sandip, Inc.*, 712 F. Supp. 2d 1325
    (N.D. Ga. 2010) ...............................................................................................8

*E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber*, 269 F.3d 187
    (3d Cir. 2001)...................................................................................................3

*Foxworthy v. Custom Tees*, 879 F. Supp. 1200 (N.D. Ga.
    1995).............................................................................9, 11, 16, 22, 23, 24

*Hadley v. Shaffer*, 2003 U.S. Dist. LEXIS 14106 (D. Del. Aug. 12, 2003) .............3

*Inwood Labs. v. Ives Labs.*, 456 U.S. 844 (1982)....................................................7

*Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833 (11th Cir.
    1983).......................................................................................................11, 17

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Kay Jewelry Co. v. Kapiloff*, 204 Ga. 209 (1948)........................................ 7, 12, 13

*Rolls Royce Motors Ltd v. A & A Fiberglass, Inc.*, 428 F. Supp 689 (N.D. Ga. 1976)................................................................................................... 12, 13

*Saunders Sys. Atlanta Co. Inc. v. Drive It Yourself Co.,* 158 Ga. 1 (1924) ...... 19, 20

*SunAmerica Corp. v. Sun Life Assurance Co. of Can.*, 77 F.3d 1325 (11th Cir. 1996)............................................................................................................. 9

*Univ. of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535 (11th Cir. 1985).. 5, 12, 14, 16, 17, 18

*Welding Services v. Forman*, 509 F.3d 1351 (11th Cir. 2007)............................. 15

**STATUTES**

15 U.S.C. § 1065 ................................................................................................. 18

15 U.S.C. § 1114(1)......................................................................................... 10, 11

15 U.S.C. § 1115(b)............................................................................................. 18

15 U.S.C. § 1125(a) ..................................................................................... 10, 11, 14

O.C.G.A. § 10-1-370 ........................................................................................... 10

O.C.G.A. § 23-2-55 ............................................................................................. 10

**TREATISE**

4 MᴄCᴀʀᴛʜʏ ᴏɴ Tʀᴀᴅᴇᴍᴀʀᴋs ᴀɴᴅ Uɴꜰᴀɪʀ Cᴏᴍᴘᴇᴛɪᴛɪᴏɴ § 23.41 (2011) ........... 19

## I.   THE PLAINTIFF

Plaintiff, Churchill Downs Incorporated, is the owner and operator of the legendary horseracing facility best known as the venue for the annual running of the Kentucky Derby. Its general history is found in case law.

> Louisville always has been a great racing center, commencing in 1839. In 1875, Colonel M. Lewis Clark was a spectator at the annual running of the English Derby, at Downs, England. Previously, and at that time, he was interested in promoting thoroughbred racing in this state. He acquired from his uncles, John H. and Hugh Churchill, a tract of land then beyond the limits of the city of Louisville. On it, he and his associates constructed buildings, customarily connected with race tracks, and a race track... In the year 1875, at the racing plant, they inaugurated the Kentucky Derby, which was modeled in general outlines after the English Derby at Downs. Continuously since that date, the soil of Churchill Downs has been a field of honor of the winners of the Kentucky Derby.

*Churchill Downs Distilling Co. v. Churchill Downs, Inc.*, 262 Ky. 567, 573 (1936).

At the outset, the proprietors of the racing operation did business under the name, Louisville Jockey Club. By the 1880s, the track itself was becoming publicly referred to as Churchill Downs. *See* Plaintiff's Exhibit 11 (hereafter "Pl. Ex."). About 1918 or 1919, ownership of the track was acquired by an investment group doing business as the Kentucky Jockey Club. Then, in 1928, the corporate name of the ownership group was formally changed to Churchill Downs.

Extolling the Derby itself, the case law notes,

> Chivalry springs from the handsome, polished horse. The Kentucky Derby exemplifies Kentucky chivalry. That story began in 1775, when the first law-making body of Kentucky met, and 'on motion of Daniel Boone, leave was given to bring in a bill for improving the breed of horses.' It was reactivated when Laurel and Rhododendron were the thoroughbreds of the Blue Grass, and was finished in the Kentucky Derby… To it, annually, pilgrimages are made from distant shores. The elite, the middle-class, the captains of industry with the occupants of cabins, from every section of our country, attend it, yet in them thereat is the democracy of peers… The celebrity of the Kentucky Derby is in every country. Each year the royal blood of the world's turf competes thereat…The name 'Churchill Downs' is inextricably interlaced with the origin, history, and fame of the Kentucky Derby. Indeed, in the esteem of the general public, they are synonyms – signifying the classic home of only cultured racers.

*Churchill Downs*, 262 Ky. at 573-574.

## II.    THE CLAIMS GENERALLY AND PROPRIETY OF GEORGIA VENUE

This case revolves around the counterfeiting, or otherwise unlawful production and sale by Defendant, Commemorative Derby Promotions, a *former* Churchill Downs licensee, of souvenir merchandise commemorating Churchill Downs and the Derby. The License Agreement is appended as Pl. Ex. 1.

Because all of the parties are resident of Louisville, Kentucky and all of the offenses and breaches which brought rise to the litigation were centered in that

2

community, litigation relating to this dispute was previously instituted by Churchill Downs in Louisville. Notwithstanding, the Lusky Defendants moved to dismiss that litigation contending that this dispute should be litigated in Georgia as provided for in a forum selection clause in the License Agreement.

As a consequence, and noting Kentucky's deference to forum selection clauses, the Louisville Court dismissed the prior lawsuit without prejudice holding that this matter must be litigated in Georgia.  Accordingly, the Lusky Defendants are deemed as a matter of law to have waived any objection to, and to have consented to the reach of this Court's personal jurisdiction over them and venue here to litigate these claims.  *See Hadley v. Shaffer*, 2003 U.S. Dist. LEXIS 14106, at *18 (D. Del. Aug. 12, 2003) (party in litigation "can not use the forum selection clause to his advantage [to obtain dismissal in one forum] and then to assert he is not bound by its terms" when litigation is re-instituted in the forum specified in the agreement.). Having successfully obtained dismissal of the Louisville litigation based upon the forum selection clause, the Defendants have waived any right to challenge litigation in Georgia; they are now "bound by the forum selection clause" and are deemed to "have expressly consented to the jurisdiction of this Court." *Id.* at *20. *See also E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber*, 269 F.3d 187, 199-200 (3d Cir. 2001) (Even a non-signatory related party is

equitably estopped from relying on a contract provision in one forum, then challenging the provision in another; "non-signatory bound by contract under which it received the direct benefits").

### III.   ADDITIONAL FACTUAL BACKGROUND

Churchill Downs is the owner of numerous trademark registrations issued by the United States Patent & Trademark Office, registration of the mark, CHURCHILL DOWNS, (Reg. No. 1,557,889); registration of the mark, THE KENTUCKY DERBY, (Reg. No. 1,534,197); and registrations of the mark, KENTUCKY DERBY, (Reg. Nos. 3,697,785; 3,740,846; 3,981,908; 3,994,346). *See* Pl. Exs. 2 through 7.

As with many sporting events, there is appreciable consumer demand for souvenir merchandise. Case law associated with the famed Boston Marathon refers to merchandise of this sort as "promotional goods," specifically, "goods which are adorned so as to *capitalize* on the" sporting event. *Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 28 (1st Cir. 1989) (emphasis added).  *See also Bd. of Supervisors of La. State Univ. v. Smack Apparel Co.,* 550 F.3d 465, 477-78 (5th Cir. 2008), *cert. denied*, 129 S.Ct. 2759 (2009) (goods bearing "team emblems and symbols are sold because they serve to identify particular teams, organizations, or entities with which people wish to identify"). Thus, for example, there is a ready

made market demand for "shirts… designed to call Universities to the mind of the fans… [F]ans purchase t-shirts to wear to football games to show the colors of the team that the consumer is supporting. In other words, fans desire to wear the t-shirts precisely because they show the Universities' marks." *Id*. at 488.

Proprietors of teams or sporting events thus make available "official" merchandise. The Eleventh Circuit notes this has become so prevalent,

> members of the public … assume that products bearing the mark of a school or sports team are sponsored or licensed by the school or team. See also *National Football League Properties, Inc*., [532 F.Supp. 651, 659 (W.D.Wash. 1982)] (survey revealed that roughly half of all persons shown football jerseys containing names of National Football League teams and players 'believed that the manufacturer was required to obtain authorization from the NFL or one of the member clubs in order to manufacture the jerseys').

*Univ. of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535, 1546 n.28 (11th Cir. 1985). *See also Boston*, 867 F.2d at 31 n.7 ("public will infer sponsorship").

Further noted by the Eleventh Circuit, fans want "official" merchandise.

> [I]n our view, most consumers who purchase products containing the name or emblem of their favorite school or sports team would prefer an officially sponsored or licensed product to an identical non-licensed product. Were this not true, the word 'official' would not appear in so many advertisements for such products.

*Univ. of Georgia*, 756 F.2d at 1546 n. 28

Similarly, horseracing fans seek souvenir merchandise commemorating Churchill Downs and the Derby.  Indeed, pursuant to the License Agreement, Commemorative Derby Products obtained the right to market merchandise bearing Churchill Downs "Licensed Indicia," namely merchandise bearing "trademarks, service marks, logographics, copyrights and symbols associated with or referring to" Churchill Downs. *See* Pl. Ex. 1 at § 1(a).

Defendants license to commercialize symbols associated with Churchill Downs ended December 31, 2010. The effect is that Defendant was required to then "immediately discontinue the manufacture, advertising, use, distribution and sale" of Churchill Downs and Derby merchandise. *Id.* at §§ 1.(a) & 16.(a).

Notwithstanding this termination, Defendants continue to commercialize the Churchill Downs symbols. *See* Pl. Exs. 8 through 15. Not only are Defendants doing so in violation of the termination provision of the License Agreement, but they even go so far as to market the merchandise as "Authentic" Derby merchandise, *see* Pl. Exs. 8 and 10 through 12. They also continue to advertise the offending merchandise as " 'Churchill Downs' most popular ***officially licensed Kentucky Derby apparel***." *See* Pl. Exs. 13 & 14 (emphasis added). Also, at least one of Defendants' retail accounts resells the offending products as "Official Derby" merchandise. *See* Pl. Ex. 15.  Hence, this lawsuit.

6

## IV.   ARGUMENT

### A.   PUBLIC POLICY

As the Supreme Court notes, the policy of trademark and unfair competition laws are to protect against two harms,

> [T]he infringer  [1] deprives the owner of the goodwill which he spent energy, time, and money to obtain. . . . At the same time, the infringer [2] deprives consumers of their ability to distinguish among the goods of competing manufacturers [citations omitted].

*Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 854, n. 14 (1982) (emphasis added). Both the Eleventh Circuit and the Supreme Court of Georgia also expressly recognize these dual policy interests. *See Davidoff & Cie, SA v. Lancaster Group US LLC*, 263 F.3d 1297, 1301 (11th Cir. 2001) (In the federal trademark law, "Congress sought to protect two groups: consumers and registered trademark owners"); and *Kay Jewelry Co. v. Kapiloff*, 204 Ga. 209, 211 (1948) ( "Under the modern view, the emphasis in cases concerning an infringement of trade name or unfair competition is… injury suffered by [1] the complaining party and [2] the public from the confusion resulting from the infringer's acts").

### B.   REFUSAL BY FORMER LICENSEE TO CEASE COMMERCIALIZATION OF CHURCHILL DOWNS INSIGNIA

By continuing to produce and sell Churchill Downs and Kentucky Derby merchandise following expiration of its license right to do so, Commemorative

Derby Promotions is unlawfully capitalizing on the reputation and good will of Churchill Downs. The refusal of a former licensee to discontinue its sales of the offending merchandise is not only a clear breach of the license agreement, it also is, as noted by the Eleventh Circuit, a classic example of trademark infringement.

> Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks… Consumers automatically would associate the trademark user with the registrant and assume that they are affiliated… [M]any courts have held that continued trademark use by one whose trademark license has been cancelled satisfies the likelihood of confusion test and constitutes trademark infringement.

*Burger King Corp. v. Mason*, 710 F.2d 1480, 1492-1493 (11th Cir. 1983) (internal citation omitted). *See also Dunkin' Donuts Franchised Rests. LLC v. Sandip, Inc.*, 712 F. Supp. 2d 1325, 1329 (N.D. Ga. 2010) ("summary judgment on… trademark claims" appropriate when former licensee continues to utilize the licensed marks).

## C.    CONTRACTUAL STIPULATION TO INJUNCTION

The next running of the Kentucky Derby is on May 5. The pre-Derby merchandising season is upon us mandating this motion for expedited relief to compel compliance with the Defendants' contractual obligation to "immediately discontinue the manufacture, advertising, use, distribution and sale" of Churchill Downs and Derby merchandise. *See* Pl. Exs. at §§ 1.(a) & 16.(a).

8

It is well recognized that when there is ongoing trademark infringement, "complete injunctions against the infringing party are the order of the day." *SunAmerica Corp. v. Sun Life Assurance Co. of Can.*, 77 F.3d 1325, 1336 (11th Cir. 1996). *See also Foxworthy v. Custom Tees*, 879 F. Supp. 1200, 1219 (N.D. Ga. 1995) ("trademark actions are common venues for…preliminary injunctions" ).

Indeed, in the License Agreement, Defendant, Commemorative Derby Promotions acknowledged the propriety of immediate injunctive relief:

> Licensee acknowledges that its breach or threatened breach of this agreement will result in immediate and irreparable damage to [Churchill Downs] and that money damages alone would be inadequate to compensate [Churchill Downs]. Therefore, in the event of a breach or threatened breach of this agreement by Licensee [Churchill Downs] may, in addition to other remedies, immediately obtain and enforce injunctive relief prohibiting the breach or threatened breach or compelling specific performance.

*See* Pl. Ex. 1 at § 7.(g), p. 9.

## D.   PRELIMINARY INJUNCTION STANDARD

Even without this contractual stipulation, injunctive relief is clearly appropriate under the principles of equity. The well recognized test is, of course,

> A party seeking a preliminary injunction for trademark infringement must establish four elements: (1) substantial likelihood of success on the merits; (2) that it would be irreparably harmed if injunctive relief were denied; (3) that the threatened injury to the trademark owner

> outweighs whatever damage the injunction may cause the alleged infringer; (4) that the injunction, if issued, would not be adverse to the public interest.

*Davidoff*, 263 F.3d at 1300.

### (i)   "SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS"

The issue on the merits is whether Commemorative Derby Promotions is *unlawfully* capitalizing on the reputation of Churchill Downs, thus committing trademark infringement or unfair competition.

Defendants' unauthorized commercialization of marks of Churchill Downs and other symbols associated with or referring to Churchill Downs constitutes trademark infringement under Section 32(1) of the Lanham Act, unfair competition under Section 43(a) of the Lanham Act, and violation of the common law and the statutory law of Georgia, O.C.G.A. § 10-1-370 *et seq*, and O.C.G.A. § 23-2-55.

Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), allows the owner of a federally registered trademark to bring an action for infringement against anyone using that mark or a similar mark in a manner likely to cause consumer confusion. In pertinent part, Section 32(1)(a) prohibits "use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods

or services on or in connection with which such use is likely to cause confusion, or

to cause mistake, or to deceive."

Similarly, Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits

unfair competition.  In pertinent part, section 43(a) provides:

> (1) Any person who, on or in connection with any goods
> or services, or any container for goods, uses in commerce
> any word, term, name, symbol, or device, or any
> combination thereof, . . . which –
> > (A) is likely to cause confusion, or to cause
> > mistake, or to deceive as to the affiliation,
> > connection, or association of such person with
> > another person, or as to the origin, sponsorship, or
> > approval of his or her goods, services, or
> > commercial activities by another person . . .
> shall be liable in a civil action by any person who
> believes that he or she is or is likely to be damaged by
> such act.

For purposes of this litigation, the only significant distinction between these

provisions is that 32(1) applies only to registered marks whereas 43(a) applies to

both registered *and unregistered* marks.  *Foxworthy*, 859 F.Supp at 1209 ("Section

43(a) protects unregistered, common law trademarks"). Since many of the

Churchill Downs marks are registered, both sections 32(1) and 43(a) are

applicable.  To succeed on either claim, Churchill Downs must prove only that the

offending behavior is "likely to cause confusion." *Jellibeans, Inc. v. Skating Clubs

of Georgia, Inc.*, 716 F.2d 833, 839 (11th Cir. 1983).

> The foundation of trademark infringement is a likelihood of confusion, mistake or deception. Such confusion need not always be that of a potential purchaser but can exist where 'the defendant duplicated the protected marks and sold them to the public knowing that the public would identify them as being the [plaintiffs'] trademarks.

*Rolls Royce Motors Ltd v. A & A Fiberglass, Inc.*, 428 F. Supp 689, 694 (N.D. Ga. 1976) (quoting *Boston Prof'l Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1012 (5th Cir. 1975) (other internal citation omitted).

The likelihood of confusion test also governs unfair competition claims under Georgia law.  *See Univ. of Georgia*, 756 F.2d at 1539 n.11; and *Bd. of Regents v. Buzas Baseball, Inc.*, 176 F.Supp.2d 1338, 1350-51 (N.D. Ga. 2001).

### (1)   Trademark Infringement and Unfair Competition Generally

Cognizant of the policy interests associated with the trademark infringement and unfair competition, the courts typically "are seeking to protect the good-will and reputation of the plaintiff." *Kay Jewelry*, 204 Ga. 209 at 211.

> The basic principle of the law of unfair competition is that [1] no one has a right to dress up his goods or business or otherwise represent the same in such manner as to deceive an intending purchaser and induce him to believe he is buying the goods of another, and that [2] no one has a right to avail himself of another's favorable reputation in order to sell his own goods.

*Atlanta Paper Co. v. Jacksonville Paper Co.,* 184 Ga. 205, 213 (1937). "It is

enough that a motivating reason behind the purchase of the infringing article is its association with the trademark owner." *Rolls Royce*, 428 F. Supp. at 695.

Especially remarkable and pertinent to this case, the very case law precedent followed by the Supreme Court of Georgia in the *Kay Jewelry* case was a case involving unlawful poaching off of the reputation of Churchill Downs. *Id.* at 210-11 (citing *Churchill Downs*, 262 Ky. 567). In the precedent followed by the Supreme Court of Georgia, the Court held it was unlawful for the Defendant to make unlicensed commercial uses referencing Churchill Downs "with the intent and purpose of his corporation deriving a profit in the sale of products, from the reputation and renown of Churchill Downs." *Churchill Downs*, 262 Ky. at 572.

Also especially analogous is the case law dealing with the sale of unauthorized merchandise commemorating the famed Boston Marathon. *Boston*, *supra*. There the Defendant was producing and selling unauthorized souvenir shirts bearing (1) the word "Marathon," (2) a photograph of runners, and (3) the words "Hopkinton-Boston," which are the start and end points of the famed marathon. Notably, the shirts did not use the words, "Boston Marathon," the actual name of the race. Nonetheless, in context, the reference was clear.

> Defendants' shirts are clearly designed to take advantage
> of the Boston Marathon and to benefit from the good will
> associated with its promotion by plaintiffs. Defendants
> thus obtain a 'free ride' at plaintiffs' expense. In the oft

> quoted words of the Supreme Court in *International News Service v. Associated Press,* 248 U.S. 215 (1918), because the Boston Marathon has achieved its renown as a result of BAA's 'expenditure of labor, skill, and money,' such unlicensed use of BAA's mark would permit defendants to 'reap where [they have] not sown.'

867 F.2d at 33.

The forbidden behavior, as noted by the Eleventh Circuit in its famous "Battlin' Bulldog Beer" case, is that it is unlawful to commercially poach off of the well known reputation of another; it is unlawful to use insignia identifiable with some other endeavor in a marketing context in which the simulated insignia will be "'the triggering mechanism' for the sale of the product." *Univ. of Georgia*, 756 F.2d at 1546 (quoting *Dallas Cap*, 510 F.2d at 1012).

### (2)   The Test of Trademark Infringement and Unfair Competition

Here we are dealing with "promotional goods," specifically, "goods which are adorned so as to *capitalize* on" a sporting event. *See Boston*, 867 F.2d at 28-29 ("the purchasing public is likely to believe that the sponsor of the Boston Marathon produces, licenses, or otherwise endorses defendants' shirts").  The concern here, to parrot section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), is that the offending merchandise will create a risk of confusing Derby fans "as to the… sponsorship, or approval [by Churchill Downs] of [Defendants] goods," that is to say, the risk some

14

consumers might suspect Defendants' products are in some way affiliated with

Churchill Downs. This is known as the "likelihood of confusion" test.

> Likelihood of confusion is assessed by examining seven factors: (1) distinctiveness of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity  between the goods or services offered under the two marks; (4) similarity of the actual sales methods used by the two parties, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) existence and extent of actual confusion in the consuming public.

*Welding Services v. Forman*, 509 F.3d 1351, 1360 (11th Cir. 2007).[1]  A plaintiff

need not show that all, or even most, of the factors support a finding of likely

confusion.  *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1538 (11th Cir. 1986).

An application of the factors to this case demonstrates a clear risk of a

likelihood of confusion.

### (3)   Intent of Defendants to Misappropriate Churchill Downs Good Will

It is perhaps more common for Courts to consider the likelihood of

confusion factors *seriatim* in the order set forth above. However, considering that

Defendants, while licensed, reaped the benefit of being an "official" Churchill

---

[1] This test is expressly used in Georgia state law trademark infringement and unfair competition claims. *Ackerman Sec. Sys. v. Design Sec. Sys.*, 201 Ga. App. 805, 806 (1991).

Downs licensee and now persist with Derby merchandising, it is much more appropriate to begin the analysis focusing on the "intent" factor.

Although an intent to misappropriate another's good will need not be proven to support an unfair competition claim,[2] when there is use of similar indicia with an *intent* to exploit the reputation of another, this is a most critical factor.

> The intent of defendants… is a critical factor, since if the mark was adopted with the intent of deriving benefit from the reputation of [the plaintiff] that fact alone may be sufficient to justify the inference that there is confusing similarity.

*Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir. 1980) (internal quotation omitted). Indeed, as noted by the Eleventh Circuit in the Battlin' Bulldog Beer case, when one adopts a symbol of another with the intent of capitalizing on the other's reputation, the intent and similarity of mark "factors alone are sufficient" to find infringement. *Univ. of Georgia*, 756 F.2d at 1544. Therein, the Defendant was marketing a beer bearing a bulldog symbol, with the bulldog dressed in a sweater with a "G" monogram and "candidly admitted…that 'Battlin' Bulldog Beer' was intended to capitalize on the popularity of the University of Georgia football program." *Id.* at 1545. That "alone", the Eleventh Circuit held

---

[2] *Foxworthy,* 879 F.Supp at 1214.

was "sufficient to support the district court's finding of a likelihood of confusing" customers. *Id.* at 1544-45.

### (4)    Distinctiveness of the Marks At Issue

The focus of this factor is the recognizability of the marks. The concern is, "How distinctive is the plaintiff's mark? Do consumers strongly identify plaintiff's service mark with his services? This is important because the more distinctive the plaintiff's mark, the stronger it is considered, and the more protection it is accorded from confusingly similar marks." *Jellibeans*, 716 F.2d at 840.

Perhaps this Court will take notice – surely Defendants will not claim otherwise – CHURCHILL DOWNS and KENTUCKY DERBY are strong, well known, indeed famous marks.  Even case law so recognizes.

> From the world's viewpoint, the Kentucky Derby at Churchill Downs and the English Derby at Downs are the outstanding events of the turf . . . . ***The celebrity of the Kentucky Derby is in every country.*** Each year the royal blood of the world's turf competes thereat. . . .***The name 'Churchill Downs' is inextricably interlaced with the origin, history, and fame of the Kentucky Derby. Indeed, in the esteem of the general public, they are synonyms--signifying the classic home of only cultured racers.***

*Churchill Downs*, 262 Ky. at 573-574 (emphasis added).

Not only are the CHURCHILL DOWNS and THE KENTUCKY DERBY marks famous, but some of the registrations of the marks, e.g. Pl. Exs. 2 & 3, have

become incontestable pursuant to 15 U.S.C. §§ 1065, 1115(b). This too is "[a]nother indicator of the strength of a mark . . . because incontestability enhances the strength of a mark." *Buzas Baseball*, 176 F.Supp.2d at 1351.

The very reason Defendants utilize the marks is because they are strong and famous. The target consumers desire Derby mementos; the Derby reference is the "triggering mechanism" for the demand. *See Univ. of Georgia*, 756 F.2d at 1546 (quoting *Dallas Cap*, 510 F.2d at 1012). When consumers encounter Defendants' merchandise, they will identify the merchandise as commemorative of Churchill Downs, the Derby and the fame associated therewith. Consideration of this factor supports a finding of likelihood of confusion.

### (5)    Similarity Of The Marks

Trademark infringement is not limited to use of exact replicas of marks of another. The key is whether there is similarity in a market context likely to engender confusion. In assessing similarity, "[a] mark must be viewed in its entirety and in context. It is the overall impression that counts." *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 502 (5th Cir. 1979). The "overall impression includes the manner in which a particular mark or designation is to be used." *Id.* The focus is to consider "the impression which the mark as a whole

creates on the average reasonably prudent buyer." 4 McCarthy on Trademarks and Unfair Competition § 23.41 (2011).

In addition to making commercial use of the exact marks, CHURCHILL DOWNS and KENTUCKY DERBY, Defendants also use the reference DERBY, without the word "Kentucky," albeit always in market contexts where it is clear the Defendant's merchandise is intended to commemorate the Kentucky Derby. Indeed, Defendant's product labels even note the products relate to "thoroughbred racing's signature event." *See* Pl. Ex. 9.

Churchill Downs owns no exclusivity to use of the word "derby" *out of context.* In other contexts the word "derby" has various meanings such as derby hat, roller derby, Florida Derby and so forth. However, Defendants' use of the word Derby expressly references "thoroughbred racing's signature event," a reference, *in context*, to the famed Kentucky Derby.

Although the word "derby" alone might be generic in some contexts, the use nonetheless should be enjoined as *unfair competition* when the context of use suggests to consumers the products originate with, or are sponsored or endorsed by Churchill Downs.  *See Saunders Sys. Atlanta Co. Inc. v. Drive It Yourself Co.,* 158 Ga. 1 (1924). As noted by the Supreme Court of Georgia therein, a common generic phrase cannot necessarily "be exclusively appropriated, " however,

injunctive relief is nonetheless available "by proving further that the defendant was using it under circumstances or in such a manner as to put off his goods as the goods of the plaintiff." *Id.* at 6-7.

Our case is essentially identical to what the Court was dealing with in the Boston Marathon case. *Boston*, *supra*. There the Defendant was producing and selling unauthorized souvenir shirts bearing the word "Marathon," not the actual name of the event, the "Boston Marathon." Nonetheless, in context,

> Defendants' shirts are clearly designed to take advantage of the Boston Marathon and to benefit from the good will associated with its promotion by plaintiffs. Defendants thus obtain a 'free ride' at plaintiffs' expense. In the oft quoted words of the Supreme Court in *International News Service v. Associated Press,* 248 U.S. 215 (1918), because the Boston Marathon has achieved its renown as a result of BAA's 'expenditure of labor, skill, and money,' such unlicensed use of BAA's mark would permit defendants to 'reap where [they have] not sown.' *Id.* at 129.

*Id.* at 33.

A more recent nationally famous case of considerable pertinence is *Smack Apparel*, *supra* (550 F.3d 465). There, the Defendant was playing off of the affinity of collegiate sports fans to wear merchandise bearing the colors of their university of choice. The trick tried by Smack Apparel was it did not use any *actual trademarks*. For example, a t-shirt it targeted to fans of Louisiana State University

20

utilized that school's colors, purple and gold, and the text, "2003 College Football Champions" *without explicitly identifying LSU*. Defendant claimed the colors themselves were generic and that LSU owned no right to monopolize the colors purple and gold. Notwithstanding, because of the ***context in which the colors were being utilized,*** the Court rejected this defense noting,

> [T]he universities do not claim that every instance in which their team colors appears violates their respective trademarks. Instead, the claimed trademark is in colors on merchandise that combines other identifying indicia referring to the Universities. It is appropriate therefore to consider not only the color ***but also the entire context*** in which the color and other indicia are presented on the t-shirts at issue here.

*Id.* at 475.  Although not utilizing any of the Universities' actual marks, the products were "designed to create the illusion of affiliation with the Universities and essentially obtain a 'free ride' by profiting from confusion among the fans of the Universities' football teams who desire to show support for and affiliation with those teams." *Id.* at 483-84. This was held to be unlawful.

Here, Defendants are using marks and other indicia in a context identifiable only with the Churchill Downs and the Kentucky Derby seeking to profit off the fame and notoriety of the Derby. That is unfair competition *and* a violation of the contractual obligation to cease commercial use of any "trademarks, service marks,

logographics, copyrights **and symbols associated with or referring to" Churchill Downs**. *See* Pl. Ex. 1 at § 1.(a) (emphasis added).

### (6)    Similarity of Products, Trade Channels & Advertising Methods

Defendants use Churchill Downs' marks and other indicia in a context identifiable only with Churchill Downs and the Kentucky Derby. They market the merchandise as commemorative of "thoroughbred racing's signature event," a reference to THE Derby.  *See* Pl. Ex. 9.  All of this they do in direct competition with Churchill Downs and its current licensed vendors. They target the same customers in the same channels of trade. Indeed, in many retail outlets, the offending products are displayed side-by-side or intermingled with official Churchill Downs products. *Id.* at 482 (market display of offending merchandise "alongside officially licensed merchandise" capitalizes on potential for confusion).

The marketplace here relates to relatively low-cost souvenir items, typically, t-shirts, which "are relatively inexpensive impulse items that are not purchased with a high degree of care. Where items are relatively inexpensive, a buyer may take less care in selecting the item, thereby increasing the risk of confusion." *Id.* at 483. *See also Foxworthy*, 879 F. Supp. at 1216 ("t-shirts are inexpensive items of apparel, and…they are considered an 'impulse' purchase").

22

Examination of these factors in relation to the market here in issue suggests there will be a likelihood of confusion.

### (7)   Actual Confusion

The issue is whether there is "likely," not "actual" confusion. "Although evidence of actual confusion is obviously the best evidence of a likelihood of confusion, it is not necessary to a finding of likelihood of confusion." *Ackerman*, 201 Ga. App. at 806 (citing *Amstar*, 615 F.2d at 263). Indeed, with impulse products, a customer may purchase a souvenir believing it is officially licensed and never realize it was not, thus not likely to ever complain.  *See Foxworthy*, 879 F. Supp. at 1216 ("where the products are relatively inexpensive and constitute impulse purchases, evidence of actual confusion can be elusive").

What it is important to recognize here, "[t]he confusion or deceit requirement is met by the fact that the defendant duplicated the protected trademarks and sold them to the public knowing that the public would identify them as being the… trademarks" of the plaintiff. *Dallas Cap*, 510 F.2d at 1012. Defendants sell Derby merchandise to fans of the Kentucky Derby.  The target customers will obviously recognize the merchandise as references to Churchill Downs and the Kentucky Derby.  "The confusion or deceit requirement is met." *Id.*

### (ii) "IRREPARABLE HARM"

It is well recognized there is a risk of irreparable harm when a showing of infringement is made. "When a plaintiff makes a *prima facie* showing of … trademark… infringement, irreparable harm is ordinarily presumed." *Foxworthy*, 879 F. Supp. at 1219.

### (iii) "THREATENED INJURY TO THE TRADEMARK OWNER OUTWEIGHS WHATEVER DAMAGE THE INJUNCTION MAY CAUSE THE ALLEGED INFRINGER"

Similarly, when it appears likely the trademark owner will prevail on the merits, the balance of hardships weigh in favor of an injunction to protect the trademark owner's interests. "Issuing the injunction…will harm defendants only to the extent that they cannot sell illegally infringing t-shirts. This factor favors plaintiff." *Foxworthy*, 879 F. Supp. at 1219.

### (iv) "INJUNCTION, IF ISSUED, WOULD NOT BE ADVERSE TO THE PUBLIC INTEREST"

A basic policy interest of trademark infringement and unfair competition law is to protect consumers from confusion.  When a trademark owner shows a substantial likelihood of success on the merits, an "injunction is not adverse to the public interest, because the public interest is served by preventing consumer confusion in the marketplace." *Davidoff*, 263 F.3d at 1304.

24

## V.   CONCLUSION

Based upon the foregoing, it is apparent Defendants are unfairly competing

with and infringing the trademarks of Churchill Downs. Unless enjoined, this

behavior risks injury to the public and irreparable harm to Churchill Downs.

Accordingly, entry of a Preliminary Injunction is appropriate.

/s/Donald R. Andersen
Donald R. Andersen
GA Bar No. 016125
dandersen@stites.com
**STITES & HARBISON, PLLC**
303 Peachtree Street, N.E.
2800 SunTrust Plaza
Atlanta, GA 30308
Telephone: 4 04.739.8800
Facsimile:  404.737.8870

Jack A. Wheat (*pro hac vice pending*)
KY Bar No. 75945
jwheat@stites.com
Lindsay Yeakel Capps
KY Bar No. 92726
lcapps@stites.com
**STITES & HARBISON, PLLC**
400 West Market Street, Suite 1800
Louisville, KY  40202-3352
Telephone:  502.587.3400
Facsimile:  502.587.6391

Counsel for Plaintiff

CH138:0CH10:869818:3:LOUISVILLE

## <u>CERTIFICATE OF FONT AND SIZE</u>

By signature below, counsel hereby certifies that this Memorandum of Authority in Support of Churchill Downs Motion for Preliminary Injunction is a computer generated document, with one-inch margins on the left side of each page and one-and-one-half inch margins on the top of each page, and typed in Times New Roman, font size 14, as required by Local Rule 5.1, NDGa.

*/s/Donald R. Andersen*
Donald R. Andersen
One of Plaintiff's Counsel