IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHURCHILL DOWNS INCORPORATED,

      Plaintiff,

                                CIVIL ACTION NO.

v.                           1:12-cv-0517-JEC

COMMEMORATIVE DERBY PROMOTIONS,
INC. and LEONARD LUSKY,

      Defendants.

## ORDER & OPINION

This case is before the Court on defendants' motion for summary judgment [67] and plaintiff's motion for partial summary judgment [72]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendants' motion for summary judgment [67] should be **DENIED** and plaintiff's motion for partial summary judgment [72] should be **GRANTED**. The Court further **DENIES as moot** plaintiff's motion for preliminary injunction [22], **DENIES as moot** plaintiff's motion to supplement amended motion for preliminary injunction [38], **DENIES** defendants' motion for leave to file amended answer and counterclaim [40], **DENIES as moot** defendants' motion to compel [43], and **DENIES as moot** defendants' motion for extension of time to complete discovery [60].

## BACKGROUND

This case involves federal and Georgia state actions for trademark infringement and unfair competition, as well as an action for breach of licensing agreement under Georgia law. (Compl. [1] at ¶¶ 45-119.) Churchill Downs Incorporated ("plaintiff") owns and operates Churchill Downs, the horse-racing facility in Louisville, Kentucky where the Kentucky Derby and Kentucky Oaks horse races are held annually. (Pl.'s Br. in Supp. of Am. Mot. for Prelim. Inj. ("Pl.'s Am. Br.") [22] at 1.) Plaintiff holds trademarks related to Churchill Downs, the Kentucky Derby, and the Kentucky Oaks. (*Id.* and Pl.'s Br. in Supp. of Mot. for Prelim. Inj. ("Pl.'s Br.") [3] at Ex. 4.) Commemorative Derby Promotions, Inc. and Leonard Lusky ("defendants") are in the business of selling horse-racing commemorative merchandise, including clothing and souvenirs. (Defs.' Am. Resp. [26] at 4.)

In the mid-2000s, defendants developed the idea for a horse-racing "Dirt Shirt," which is a t-shirt dyed with the dirt and turf gathered from a racetrack. (*Id.* at 6.) In 2007, plaintiff contacted defendants about making a Dirt Shirt dyed with dirt from Churchill Downs. (*Id.* at 6-7.) Subsequent negotiations yielded a License Agreement authorizing defendants to produce and sell these Dirt Shirts, along with poker chips and a "nostalgia collection" of memorabilia, all bearing the Churchill Downs or Kentucky Derby

2

trademarks. (Compl. [1] at Ex. 1.) The License Agreement contained a post-termination clause, which provided that defendants "shall immediately discontinue" their use of "all Licensed Indicia" and "all similar marks" upon expiration or termination of the Agreement. (*Id.* at § 16(a).)

The License Agreement expired on December 31, 2010. (*Id.*) Yet, according to plaintiff, defendants continued to sell products that use the "Licensed Indicia," in violation of the post-termination provisions, and otherwise infringe upon plaintiff's protected marks. (Pl.'s Statement of Material Facts ("PSMF") [72] at ¶¶ 56-57.) The allegedly offending products primarily include t-shirts that commemorate the Kentucky Derby and Churchill Downs. (Pl.'s Mot. for Prelim. Inj. [3] at Exs. 8-13 and Am. Mot. [22] at Exs. 33-36.) The shirts contain lists of past Kentucky Derby winners and various insignia associated with Churchill Downs and the Kentucky Derby. (*Id.*)

Based on the above conduct, plaintiff filed this action asserting claims for trademark infringement, unfair competition, and breach of the License Agreement. (Compl. [1] at ¶¶ 45-119.) Shortly thereafter, plaintiff moved for a preliminary injunction. (Pl.'s Mot. for Prelim. Inj. [3].) The Court ordered plaintiff to submit supplemental briefing specifying the infringing products. (Order [21].) In response to the Order, plaintiff filed an amended motion

3

for preliminary injunction. (Pl.'s Am. Mot. for Prelim. Inj. [22].)
Subsequently, plaintiff filed a motion to supplement its amended
motion for a preliminary injunction, as well as a motion to compel.
(Pl.'s Mot. to Compel [33] and Mot. to Supplement [38].) Defendants
responded with several discovery motions of their own and a motion
for leave to amend their Answer and to add a counterclaim. (Defs.'
Mot. for Leave [40], Mot. to Compel [43], Mot. for Protective Order
[55], and Mot. for Extension of Time to Complete Discovery [60].)

In spite of the pending discovery motions and motion to amend,
the parties both moved for summary judgment. (Defs.' Mot. for Summ.
J. [67] and Pl.'s Mot. for Summ. J. [72].) Plaintiff subsequently
withdrew its pending motion to compel discovery and motion for
protective order. (Pl.'s Notice of With. [84].)

**DISCUSSION**

**I.   SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when the pleadings, the
discovery and disclosure materials on file, and any affidavits show
that there is no genuine issue as to any material fact and that the
movant is entitled to a judgment as a matter of law. FED. R. CIV. P.
56(c). A fact's materiality is determined by the controlling
substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
(1986). An issue is genuine when the evidence is such that a
reasonable jury could return a verdict for the nonmovant. *Id.* at

4

249-50.   The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits.  Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In such a situation, there can be "'no genuine issue as to any material fact,'" as "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial."  *Id.* at 322-23 (quoting FED. R. CIV. P. 56(c)).

The movant bears the initial responsibility of asserting the basis for his motion.  *Id.* at 323.  However, the movant is not required to negate his opponent's claim.  The movant may discharge his burden by merely "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the non-moving party's case."  *Id.* at 325.  After the movant has carried his burden, the non-moving party is then required to "go beyond the

5

pleadings" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324.  While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (1986).

## II.  <u>PLAINTIFF'S THEORIES OF LIABILITY</u>

Plaintiff seeks partial summary judgment as to its contention that defendants are liable on the claims alleging unfair competition, trademark infringement, and breach of licensing agreement.  (Pl.'s Mot. For Summ. J. [72] at 25.)

Plaintiff asserts unfair competition causes of action under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the Uniform Deceptive Trade Practices Act, enacted in Georgia as O.C.G.A. §§ 10-1-370 to -375.  (Pl.'s Mot. for Summ. J. [72] at 25.)  Plaintiff asserts trademark infringement causes of action under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), as well as O.C.G.A. § 23-2-55. (Pl.'s Mot. for Summ. J. [72] at 25.)  Regarding the federal causes of action, "[a]s a general rule...the same facts which would support an action for trademark infringement would also support an

6

action for unfair competition."[1]  *Boston Prof'l Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1010 (5th Cir. 1975). Both causes of action may be satisfied by the same "likelihood of confusion" test.[2]  *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258-59 (5th Cir.), *cert. denied*, 101 S. Ct. 268 (1980)(The likelihood of confusion test governs, *inter alia*, trademark infringement and unfair competition.)  Georgia courts likewise employ the likelihood of confusion test for unfair competition and trademark infringement actions.  *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 935 & n.16 (11th Cir. 2010); *Ackerman Sec.*

---

[1]   Decisions of the former Fifth Circuit rendered prior to October 1, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc).

[2]  The relevant statutory provision is 15 U.S.C. § 1114(1), which states:

> Any person who shall, without the consent of the registrant-
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is *likely to cause confusion, or to cause mistake, or to deceive;*....
>
> ....
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

(emphasis added).

7

*Sys., Inc. v. Design Sec. Sys., Inc.*, 201 Ga. App. 805, 806 (1991) (In a state law action for trademark infringement, deceptive trade practices, and unfair competition, "[t]he appropriate legal test for these claims is the 'likelihood of confusion' test."). As analyzing each of these causes of action would be needlessly repetitive, this Order addresses only federal trademark infringement under the Lanham Act. It should be understood, however, that satisfaction of the likelihood of confusion test for the federal trademark infringement cause of action implies satisfaction of the state trademark infringement and federal and state unfair competition claims.[3]

After analyzing plaintiff's claims subject to the likelihood of confusion test, the Court addresses plaintiff's breach of licensing agreement claim. Due to a choice of laws provision in the License Agreement, this matter is governed by Georgia contract law.

**A.   <u>The Lanham Act's Test for Trademark Infringement</u>**

To prevail in an action for trademark infringement under the Lanham Act, "the plaintiff must show, first, that its mark is valid and, second, that the defendant's use of the contested mark is likely

---

[3]   The practice of applying the likelihood of confusion test to just one of the multiple causes of action that it satisfies and then extending that analysis to the remaining claims has been noted with approval in this Circuit. *See Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 839 & n.14 (11th Cir. 1983)("If we determine that the district court decided the Lanham Act count properly, we will also affirm its decision on the Georgia deceptive trade practices and unfair competition counts.")

to cause confusion." *Dieter v. B & H Indus. of Sw. Florida, Inc.*, 880 F.2d 322, 326 (11th Cir. 1989)(citing 15 U.S.C. § 1114(1)(a)). The Court analyzes these requirements in turn.

### 1.  Validity of Plaintiff's Trademarks

"To be entitled to trademark protection, a mark must be valid and distinctive." *Atlanta Allergy and Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC*, 685 F. Supp. 2d 1360, 1367 (N.D. Ga. 2010)(Duffey, J.)(citing *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176 (11th Cir. 1985)).  Trademarks registered with the United States Patent and Trademark Office are presumptively valid.  15 U.S.C. § 1115(a).  Validity is not limited to registered trademarks, however, and "the use of another's unregistered, *i.e.*, common law, trademark can constitute a violation of § 43(a)" of the Lanham Act.  *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512-13 (11th Cir. 1984)(internal quotations and citations omitted).  To have a right in an unregistered mark, the mark must be sufficiently distinctive of the proprietor's goods or services.  *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1559 (11th Cir. 1991).  After all, only the use of another person's *distinctive* mark is likely to confuse the public.

The Eleventh Circuit classifies marks into four levels of

distinctiveness, ranging from least to most distinctive:

> (1) *generic*--marks that suggest the basic nature of the product or service; (2) *descriptive*--marks that identify the characteristic or quality of a product or service; (3) *suggestive*--marks that suggest characteristics of the product or service and require an effort of the imagination by the consumer in order to be understood as descriptive; and (4) *arbitrary or fanciful*--marks that bear no relationship to the product or service, and the strongest category of trademarks.[4]

*Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 797-98 (11th Cir. 2003)(emphasis added). Generic marks are generally barred from trademark protection. *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1358 (11th Cir. 2007). Suggestive and arbitrary or fanciful marks are considered "inherently distinctive," and thus qualified for trademark protection, because "their intrinsic nature serves to identify a particular source of a product." *Two Pesos*, 505 U.S. at 768. Falling in the middle of the spectrum are descriptive marks. Descriptive marks only acquire the distinctiveness requisite to trademark protection when they have acquired "secondary meaning." *Coach House Rest.*, 934 F.2d at 1560. The criterion of secondary meaning is that "the primary significance of the term in the minds of the consuming public is not the product but the producer." *Welding*

---

[4] The Eleventh Circuit has illustrated these categories using some possible names for a hypothetical milk-delivery business: "Milk Delivery" (generic), "BarnMilk" (descriptive), "Barn-Barn" (suggestive), and "barnbarnfish" (arbitrary or fanciful). *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1522-23 (11th Cir. 1991).

*Servs., Inc.*, 509 F.3d at 1358 (internal quotation and citation omitted). In addressing the question of secondary meaning, courts will look at "the length and nature of the name's use, the nature and extent of advertising and promotion of the name, the efforts of the proprietor to promote a conscious connection between the name and the business, and the degree of actual recognition by the public that the name designates the proprietor's product or service." *Id.*, (citing *Conagra, Inc.*, 743 F.2d at 1513).

The record shows that plaintiff has various trademarks, including registered trademarks in "Churchill Downs," "The Kentucky Derby," "Kentucky Derby," "Kentucky Derby Party," "Bring the Derby Home," and "Kentucky Jockey Club." (Compl. [1] at ¶¶ 24-30.) Defendants do not dispute plaintiff's ownership of these trademarks (Defs.' Resp. [16] and Am. Resp. [26].) The Court thus accepts them as valid. Defendants do argue, however, that plaintiff is attempting to assert rights to other, invalid marks, specifically "Derby," "Mint Julep," "Derby U," "Louisville Jockey Club," "New Louisville Jockey Club," "Derby Day," "My Old Kentucky Home," and "Derby Tradition." (Defs.' Resp. [74] at 10.) These marks, defendants contend, are neither inherently distinctive, nor have they acquired the secondary meaning required of descriptive marks for trademark protection. (*Id.*) Defendants further claim that "Derby" is generic and thus plaintiff could have no trademark rights in it. (Defs.' Resp. [16]

11

at ¶¶ 12, 14.)

The first thing to note with regard to the terms defendants identify is that the parties use them not in isolation, but in the context of other words and images that together constitute the marks. Defendants, in attempting to reduce the inquiry into one of the isolated elements of the parties' marks, distort the actual legal test, which properly looks to the whole of the mark to determine validity, not the individual parts. *See Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 362 (11th Cir. 1997)("The district court properly concluded that the validity of Plaintiff's LONE STAR CAFÉ mark is to be determined by viewing the trademark as a whole and not just the words, 'Lone Star.'")(citing *Estate of P.D. Beckwith, Inc. v. Comm'r of Patents*, 252 U.S. 538, 545-46 (1920)("The commercial impression of a trade-mark is derived from it as a whole, not from its elements separated and considered in detail.")). Thus, defendants' argument is largely misplaced. Plaintiff contends not that it holds a trademark in, for example, "Derby Tradition," but rather that defendants' use of that term in the context of other images and words that make clear that the "Derby Tradition" means a *Kentucky Derby* tradition, constitutes an infringement of plaintiff's trademark in the Kentucky Derby. (*See* PSMF [72] at ¶ 57.)

Plaintiff does, however, asserted a common-law trademark in the

name "Louisville Jockey Club," and this presents a more complicated inquiry. Within the typology of marks described above, "Louisville Jockey Club" would be a descriptive mark.[5] As a descriptive mark, the name would only warrant trademark protection if it had acquired secondary meaning. Applying the criteria for secondary meaning set out in *Welding Servs., Inc.*, it is first apparent that plaintiff has adduced considerable and conclusive evidence that it has long used "Louisville Jockey Club" in its promotional materials and merchandise for Churchill Downs and the Kentucky Derby. (PSMF [72] at ¶¶ 28-34.) Plaintiff's recent uses of the "Louisville Jockey Club" mark are part of plaintiff's broader practice of using the history of the Kentucky Derby to promote its present-day activities, as evidenced in the 2008 product, *The Kentucky Derby Vault: A History of the Run for the Roses*, which includes images and reproductions of historic artifacts bearing the "Louisville Jockey Club" mark. (*Id.* at ¶ 30; Pl.'s Reply [18] at Ex. 28 at 20 and Ex. 28A.) Plaintiff has also used historic images displaying the "Louisville Jockey Club" mark on its official Kentucky Derby programs. (Pl.'s Mot. for Summ. J. [72] at Ex. 46.) The undisputed evidence indicates that plaintiff has extensively promoted the name with the intent to instill in the public a connection between "Louisville Jockey Club" and racing at Churchill

---

[5]   Marks that indicate the geographical source of a service are considered descriptive. *Investacorp, Inc.*, 931 F.2d at 1522.

Downs.    As  a  result,  insofar  as  consumers  are  aware  of  the
"Louisville  Jockey  Club"  name,  it  is  surely  in  association  with
plaintiff's horse-racing at Churchill Downs, rather than some generic
horse-racing activities in Louisville.  Prior to defendants' alleged
infringing  use  of  the  mark,  there  is  no  evidence  that  the  name
appeared  anywhere  but  on  plaintiff's  promotional  materials  and
merchandise.  On these bases, the Court is satisfied that "Louisville
Jockey Club" has secondary meaning.

This  Court  thus  finds  that  plaintiff  holds  various  valid
registered and unregistered marks relating to Churchill Downs and the
Kentucky Derby, including "Louisville Jockey Club."  If defendants'
marks  are  likely  to  be  confused  with  these  marks,  the  trademark
infringement test is satisfied.

## 2.  Likelihood of Confusion

The  second  part  of  the  Lanham  Act  test  for  trademark
infringement requires plaintiff to prove that there is a likelihood
of confusion arising from defendants' use of the alleged infringing
marks.  The confusion may be of two sorts.  *See Univ. of Georgia
Athletic Ass'n v. Laite*, 756 F.2d 1535, 1546 (11th Cir. 1985).  It
may be consumer confusion as to whether defendants' products were
made by plaintiff, known as "confusion of goods." *Boston Athletic
Ass'n v. Sullivan*, 867 F.2d 22, 28 (1st Cir. 1989).  It may also be
confusion as to whether plaintiff "produces, licenses, or otherwise

14

endorses" defendants' goods, known as the "promotional goods" doctrine. *Id.* at 28-29. In either case, the likelihood of confusion test provides the following seven factors to consider:

> (1) distinctiveness of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods or services offered under the two marks; (4) similarity of the actual sales methods used by the two parties, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) existence and extent of actual confusion in the consuming public.

*Welding Serv., Inc.*, 509 F.3d at 1360 (citing *Conagra, Inc.*, 743 F.2d at 1514). In this Circuit, courts must consider all seven factors. *Id.* at 1361 (citing *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1207 (11th Cir. 2004)). Depending on the particular facts of the case, however, some factors might be relatively "insignificant under the circumstances." *Laite*, 756 F.2d at 1542; *see also Conagra, Inc.*, 743 F.2d at 1514 & n.8. The Court analyzes these factors seriatim.

    a.   Distinctiveness of Plaintiff's Marks

Distinctiveness is a function of how strongly consumers identify the mark with its owner's products or services. *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 840 (11th Cir. 1983). Highly distinctive marks are more likely to give rise to confusion than are less distinctive marks, and are thus granted greater

15

protection. *Id.* Courts in this Circuit have assessed distinctiveness through the following criteria: "(1) the type of mark; (2) the amount of use of the term by others in the same product and geographical area; and (3) the extent of a mark's use, taking into consideration the amount of advertising and promotion done under the mark." *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1311 (N.D. Ga. 2008)(Pannell, J.)(citing *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 973-75 (11th Cir. 1983) and *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1164 (11th Cir. 1982)).

The type of mark refers to the four-part classification used above in the analysis of mark validity. Whereas the question above was threshold validity required of marks for any protection, here the question is the degree of protection to which valid marks are entitled. "The more distinctive a plaintiff's [mark], the greater the likelihood that consumers will associate the registered mark and all similar marks with the registered owner. The law therefore provides greatest protection to strong and distinctive [marks]." *Freedom Sav. and Loan Ass'n v. Way*, 757 F.2d 1176, 1182 (11th Cir. 1985). "Kentucky Derby" might well be descriptive of a horse race in Kentucky, but it has undoubtedly acquired a very distinct secondary meaning, referring to a specific horse race performed annually at Churchill Downs. When consumers hear the name, they surely think of

16

*the* Kentucky Derby.   "Churchill Downs," on the other hand, has no apparent semantic link to horse racing, as "Churchill" is a proper name and "Downs" is a geographical term for hilly terrain.   Nothing in the words would indicate a connection to horse racing, and thus the mark is arbitrary.

As for the amount of use of the term by others in the same product and geographical area, defendants point to numerous telephone book listings in the Louisville area for businesses with "derby" in their names.   (Defs.' Mot. for Summ. J. [67] at 19; Ex. N.)   The theory is that these third-party uses dilute the strength of the mark.   These listings, however, are for products and services not likely to be confused with plaintiff's promotional materials and souvenirs, including waffles, septic tank cleaners, and limousines. As this Circuit has made clear, it is "the entire name a third-party uses, as well as the kind of business in which the user is engaged" that determines if that third-party use weakens the distinctiveness of the mark. *Trilink Saw Chain, LLC*, 583 F. Supp. 2d at 1312 (citing *Safeway Stores, Inc.*, 675 F.2d at 1165).   Thus, third-party use of the word "derby" in connection with products and services unrelated to horse-racing does little to affect the distinctiveness of plaintiff's mark.

"[T]he more that a mark has been promoted and the longer that it has been in use, the stronger the mark is likely to be." *Id.* at

17

1313.  Plaintiff has introduced evidence that unmistakably shows that it has used the history and traditions of the Kentucky Derby in its merchandising and promotions for over a century.  (PSMF [72] at ¶¶ 28-34.)  As a result of these efforts, the Kentucky Derby is perhaps the best known horse race in North America, as even defendants acknowledge.  (Pl.'s Mot. for Partial Summ. J. [72] at Ex. 34., p. 2; Answer [16] at ¶ 4.)  Thus, based on the preceding analysis, the marks are properly characterized as highly distinctive.

b.  Similarity of Plaintiff's and Defendants' Marks

Trademark infringement may arise without identical reproduction of a protected mark, because courts look to the overall similarity of the infringed and infringing marks in assessing the likelihood of confusion. *See Laite*, 756 F.2d at 1544 ("[I]t is the combination of similar...elements, rather than any individual element, that compels the conclusion that the two [marks] are similar."); *Boston Athletic Ass'n*, 867 F.2d at 29 ("Similarity is determined on the basis of the total effect of the designation, rather than a comparison of the individual features.")(citations and quotations removed); *Bd. of Supervisors for Louisiana State Univ. Agric. and Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 480-82 (5th Cir. 2008)(finding infringement where defendant's shirt clearly referred to LSU, without

18

containing the initials "LSU").[6]  Thus, this Court analyzes the marks as composite wholes, not isolated parts, and looks for overall similarity, rather than identicality.

Each of defendants' marks, when viewed as wholes, are clearly similar to plaintiff's marks.  To no avail are defendants' attempts to present its products as referring to generic horse-racing unrelated to Churchill Downs or the Kentucky Derby. (*See* Lusky Dep. at 188.)  Instructive here is the analysis in a leading case based on similar facts, in which the defendant made and sold "marathon"-themed t-shirts in Boston during the Boston Marathon, but denied that the apparel's marks referred to the Boston Marathon.  The court stated:

> It is evident that defendants' logos refer specifically to the "Boston Marathon."  There is but one Boston marathon race; defendants' logos use the term "Marathon" and depicts [sic] runners.  It is run annually; defendants' logos refer to a specific year implying an annual event.  The race begins at Hopkinton and ends in Boston; defendants' logos include these cities.

*Boston Athletic Ass'n*, 867 F.2d at 29.  Here, defendants' products include numerous references to the year 1875, including the combination of horse-racing images with the text "Derby Day" and

---

[6] As the court in *Boston Athletic Ass'n* noted, "few would be stupid enough to make exact copies of another's mark or symbol.  It has been well said that the most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts."  *Boston Athletic Ass'n*, 867 F.2d at 30 (citing *Baker v. Master Printers Union of New Jersey*, 34 F. Supp. 808, 811 (D.N.J. 1940)).

AO 72A
(Rev.8/82)

"Est. 1875". (Flanery Dep. [69], Ex. 10 at CDP000001-CDP000008, CDP000010.) The Kentucky Derby, the only "derby" race in Louisville, has been run annually since 1875. Defendants make a t-shirt with horse-racing images and the text "My Old Kentucky Home" and "A Derby Tradition." (*Id.* at CDP000012, CDP000013.) The song "My Old Kentucky Home" is traditionally sung as the anthem preceding the race at the Kentucky Derby. Defendants' products feature a racehorse draped in a garland of roses accompanied by the text "Derby Tradition" and "Est. 1875." (*Id.* at CDP000014.) Other products of Defendants feature images of roses and the words "Derby Rose." (*Id.* at CDP000024.) The Kentucky Derby is known as the "Run for the Roses" because the winning horse is draped in a garland of roses. Some of defendants' products feature images of lilies and the word "Oaks." (*Id.* at CDP000025.) The Kentucky Oaks awards a garland of lilies to its winning horse. Defendants' products feature the word "Derby" superimposed over the letter "U," along with the words "Established 1875," in the manner of many university-themed products commonly sold. (Flanery Dep. [69], Ex. 10 at CDP000028.) Although there is a University of Derby in England, it was established in 1992. In the appropriate context, the reference, as in the previous instances, could only refer to the Kentucky Derby.[7]

---

[7] A more complete catalog of convincingly similar marks is provided by plaintiff. (*See* PSMF [72] at § 62.)

Plaintiff's marks use similar words and imagery to reference the Kentucky Derby and Churchill Downs.  Some of the products made under the License Agreement display marks nearly identical to defendants' post-license marks, using the same phrases, such as "Run for the Roses" and "Est. 1875," accompanied by roses and historic images of horse-racing scenes.  (Pl.'s Mot. for Summ. J. [72] at Ex. 41.)  In other cases, defendants' marks are sometimes only slight modifications of the marks it used previously under its License Agreement with the plaintiff.  For example, one of the licensed products included an image of a mint julep with the words "Mint Condition at the Kentucky Derby."  (*Id.* at ¶ 47 and Ex. 42.)  After the expiration of the License Agreement, Defendants produced a shirt with a nearly identical image of a mint julep accompanied by the words "Julep Condition."  (Defs.' Mot. for Summ. J. [67] at Ex. F, Part 2 at CDP000015.)

It is abundantly clear that defendants' products display marks, like those at issue in *Boston Athletic Ass'n*, *Smack Apparel*, and *Laite*, that are overwhelmingly similar, at times almost identical, to plaintiff's trademarks.  Thus, the Court finds this factor to favor a finding of a likelihood of confusion.

> c.  Similarity of the Goods Offered under the Two Marks

"That the products involved are similar is evidence tending to prove the existence of a likelihood of confusion."  *AmBrit, Inc. v.*

21

*Kraft, Inc.*, 812 F.2d 1531, 1541 (11th Cir. 1986).  A comparison of the products offered under the plaintiff's and defendants' marks shows them to be quite similar.  Both parties offer similar "low-cost souvenir items" commemorating the Kentucky Derby.  (Pl.'s Br. [3] at 22.)  Although defendants are correct that their products have some features not present in the plaintiff's products, such as the "dirt shirt" concept, the distinctions are hardly substantial enough to alter how consumers would see the goods.  The products involved remain souvenirs that fans would likely purchase to display their affection for the Kentucky Derby, without giving much regard for the minor differences of quality and design.  *See Foxworthy v. Custom Tees, Inc.*, 879 F. Supp. 1200, 1216 (N.D. Ga. 1995)(Freeman, J.) (noting that "t-shirts are inexpensive items of apparel" and would be an "'impulse' purchase").  The Court thus finds this factor to weigh in favor of a likelihood of confusion.

> d.   Similarity of Sales Methods

"Likelihood of confusion is more probable if the products are sold through the same channels to the same purchasers."  *AmBrit, Inc.*, 812 F.2d at 1541.  Plaintiff's Churchill Downs and Kentucky Derby products are advertised and sold using similar methods and in similar venues as defendants' products.  (*See* Amin and Ramage Decls. [18].)  Both parties sell their products through online stores, retail outlets, and souvenir stores in the Louisville Airport.  (Amin

Decl. at ¶¶ 2-4 and Ramage Decl. at ¶ 3 and Ex. 16.)  The parties' products have even become intermingled in various retail outlets. (Amin Decl. at ¶ 4.)  The items are similar in price.  (*See* Ramage Decl. at Ex. 16 and Defs.' Resp. Br. [16] at 18.)  All of this supports the conclusion that purchasers of plaintiff's and defendants' products would acquire those items through similar channels and means.  This factor therefore supports a finding of a likelihood of confusion.

> e.  Similarity of Advertising Methods

"If the plaintiff and defendant both use the same advertising media, a finding of likelihood of confusion is more probable." *AmBrit, Inc.*, 812 F.2d at 1542.  The products at issue in this case are "low-cost souvenir items."  (Pl.'s Br. [3] at 22.)  They are properly characterized as "'impulse' purchase[s]." *Foxworthy*, 879 F. Supp. at 1216.  As such, there is little advertising or need for advertising.  The event itself--the Kentucky Derby--is what likely piques customers' attention for the products, rather than any specific advertising for the goods.  This is supported by the fact that Defendants' primary retail outlets are Kroger (a grocery store) and Paradies (a souvenir shop in the Louisville Airport).  People do not generally go to grocery stores or airports in search of t-shirts and tote bags; they acquire them from these places on impulse, as souvenirs.  Moreover, the products are marketed during Derby season,

when people in the vicinity of Louisville are likely to already have the Kentucky Derby on their minds. Thus, this factor is less relevant to the analysis of the particular facts of this case.[8] *See Laite*, 756 F.2d at 1542.

f.  Intent to Misappropriate the Good Will of Plaintiff

The intent to misappropriate the good will of the proprietor is a key factor in determining likelihood of confusion. *See Id.* at 1544-45 (Defendant intended to "catch the attention of University of Georgia football fans" with his "Battlin' Bulldog Beer," creating a likelihood of confusion.)  Intent to misappropriate another person's mark may on its own give rise to a likelihood of confusion. *Amstar Corp.*, 615 F.2d at 263 ("The intent of defendants in adopting the 'Domino's Pizza' mark is a critical factor, since if the mark was adopted with the intent of deriving benefit from the reputation of 'Domino' that fact alone 'may be sufficient to justify the inference that there is confusing similarity.'")(quoting Restatement of Torts § 729, cmt. f (1938)); *Boston Athletic Ass'n*, 867 F.2d at 35 ("[D]efendants intentionally referred to the Boston Marathon on their

---

[8]  Plaintiff does adduce some evidence that the *content* of defendants' point-of-purchase advertising displays are likely to confuse consumers, due to misleading claims that the products are "officially licensed Kentucky Derby products" and "Official Derby" products. (PSMF [72] at ¶¶ 73, 76.)  This is more appropriately addressed under the following factor: that of an intent to misappropriate plaintiff's good will.

24

shirt in order to create an identification with the event and, thus, to sell their shirts.  This evidence is itself sufficient to raise the inference of a likelihood of confusion.").

Evidence to support a finding of intent to misappropriate the plaintiff's good will is circumstantial.  Some evidence comes from the designs of defendants' products, which use words strongly suggesting an intent to capitalize on the history and renown of Churchill Downs and the Kentucky Derby.  (Pl.'s Mot. for Prelim. Inj. [3] at Exs. 8-13 and Am. Mot. [22] at Exs. 33-36.)  Defendants labeled some of their products as "authentic" or "official" Derby items, indicating an intent to lead consumers to believe there was an association of the products with the Kentucky Derby.  (Pl.'s Mot. for Prelim. Inj. [3] at Exs. 10 and 11.)  Defendants' press release describes its "Louisville Jockey Club Vintage Collection" in ways that further suggest an intent to misappropriate plaintiff's good will.  (Pl.'s Mot. for Summ. J. [72] at Ex. 37A.)  Defendant Lusky there says the collection "celebrates racing's signature event" and gives horse-racing fans an opportunity to "celebrate the origins of the Derby."  (*Id.*)  He further describes the collection as "unlike any other Derby product offering." (*Id.*)  These phrases indicate an intent to present defendants' products as celebrating the Kentucky Derby specifically, rather than the history of horse-racing generally.  They thereby demonstrate an intent to appropriate the

25

good will consumers have for plaintiff's goods and services.  This factor thus supports a finding of a likelihood of confusion.

       g.  Actual Confusion

Because direct evidence of actual confusion may be elusive in instances where the products are inexpensive, impulse purchases, an aggrieved trademark holder has a low threshold to meet.  *See AmBrit, Inc.*, 812 F.2d at 1544 ("[F]our bona fide instances of actual confusion are sufficient to support the district court's finding of actual confusion" because "[i]ce cream novelties are an impulse item that consumers purchase without a great deal of care.").  Here, plaintiff has not presented any evidence of actual consumer confusion.[9]  This, however, does not indicate that such confusion is unlikely.  Nor is it fatal to the plaintiff's action.  *See Angel Flight of Georgia, Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1206 (11th Cir. 2008)(emphasizing that a trademark infringement claim does not require evidence of actual confusion to succeed).  Because of the nature of the products at issue, the Court gives less weight to this factor of the test.

---

     [9]  There is possible evidence, however, of retailer confusion in the fact that the parties' merchandise was intermingled in some store displays.  (Amin Decl. at ¶ 4.)

26

### 3.   Conclusion of the Trademark Infringement Analysis

Based on the foregoing analysis, the only reasonable conclusion this Court may draw is that defendants infringed upon plaintiff's trademarks.   Plaintiff's trademarks are valid and distinctive. Although not all factors of the likelihood of confusion test conclusively point to a likelihood of confusion in this case, it nonetheless would be unreasonable not to conclude on the basis of the analysis of the factors *in toto* that the likelihood of confusion was very strong.   That is, consumers would be likely to believe that plaintiff somehow approved or authorized defendants' merchandise, if not that plaintiff actually made defendants' merchandise.   Five of the seven factors weigh convincingly in favor of there being a likelihood of confusion.   Although giving less support to plaintiff's case, the remaining two factors--similarity of advertising and actual confusion--are also less pertinent to the particular facts and circumstances of this case.   Courts applying the seven-factor likelihood of confusion test have routinely found it satisfied even when some of the factors are more equivocal than others as to the ultimate question.   *See Laite*, 756 F.2d at 1542 (Although the district court only discussed two of the seven factors, "[t]he fact that the court did not discuss the other five factors may indicate only that the court found those factors insignificant under the circumstances.").

27

Finally, there is further authority supporting a finding of likelihood of confusion, independent of the seven-factor test employed above.  In cases were the parties had an earlier, but since-expired, license agreement, and the defendant continues to use the plaintiff's marks in its goods or services, some courts have held that the likelihood of confusion test is satisfied by that fact alone.  *See Burger King Corp. v. Mason*, 710 F.2d 1480, 1493 (11th Cir. 1983)(noting that "many courts have held that continued trademark use by one whose trademark license has been cancelled satisfies the likelihood of confusion test and constitutes trademark infringement"); *see also Prof'l Golfers Ass'n of Am. v. Bankers Life & Cas. Co.*, 514 F.2d 665, 670 (5th Cir. 1975) and *Conagra, Inc.*, 743 F.2d at 1516.  Here, it is uncontested that there was a License Agreement that has expired.  As the evidence makes clear, defendants have made use of plaintiff's marks since the expiration of that agreement.  On that basis, this Court finds alternative grounds for deciding that defendants' actions have created a likelihood of confusion.[10]

For the above reasons, this Court finds that defendants have infringed on the plaintiff's trademark rights under the Lanham Act. As the likelihood of confusion test also satisfies the remaining

---

[10] Because the cited cases also employ the seven-factor test for likelihood of confusion, this court does so as well.

AO 72A
(Rev.8/82)

causes of action for unfair competition and trademark infringement, this Court finds summary judgment appropriate on each of the trademark infringement and unfair competition claims.[11]

   B. **Breach of License Agreement Claim**

   Plaintiff alleges defendants have breached the License Agreement in applying to the United States Patent and Trademark Office for trademarks for "Kentucky Jockey Club" and "Louisville Jockey Club."[12] (Compl. [1] ¶¶ 111 - 119.)  Defendants contend that the contract is irrelevant to these trademark applications.  Deciding this issue requires analysis of the contract.

   The License Agreement has a choice of laws provision stating that it "shall be governed by and construed in accordance with the laws of the state of Georgia." (Comp. [1] at Ex. 1, § 25.)  "[T]he construction rules decided by Georgia courts are applicable in federal court when interpreting a contract controlled by Georgia law."  *In re Club Assoc.*, 951 F.2d 1223, 1229 (11th Cir. 1992).

―――――――

   [11]  This conclusion would not be changed by the amended answer submitted by defendants.  Because the Court finds that plaintiff holds valid trademarks on which defendants have infringed, defendants' counterclaim for intentional interference with business relations and punitive damages fails.  Thus, the Court **DENIES** defendants' motion for leave to file amended answer and counterclaim [40]

   [12]  Defendants have voluntarily assigned the trademark "Kentucky Jockey Club" to plaintiff, leaving in dispute only "Louisville Jockey Club," the application for which is currently pending at the United States Trademark and Patent Office.  (PSMF [72] at ¶¶ 92-95.)

AO 72A
(Rev.8/82)

Under Georgia law, "[t]he construction of a contract is a question of law for the court," O.C.G.A. § 13-2-1, and "[m]erely because the parties disagree upon the meaning of contract terms will not transform the issue of law into an issue of fact." *In re Club*, 951 F.2d at 1230 (quoting *Gen. Wholesale Beer Co. v. Theodore Hamm Co.*, 567 F.2d 311, 313 (5th Cir. 1978)).  Under Georgia law:

> The construction of contracts involves three steps. At least initially, construction is a matter of law for the court. First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

*CareAmerica, Inc. v. S. Care Corp.*, 229 Ga. App. 878, 880 (1997) (citation omitted); *see also In re Club Assoc.*, 951 F.2d at 1230 and *Stephens v. Trust for Pub. Land*, 479 F. Supp. 2d 1341, 1348 (N.D. Ga. 2007).  Thus, this Court first looks to the language of the contract.

The Licensing Agreement required defendants to "not, at any time, file any trademark application with the United States Patent and Trademark Office for the Licensed Indicia." (Compl. [1] at Ex. 1, § 7(a).)  "Licensed Indicia" is a defined term in the contract, and "means the designs, trademarks, service marks, logographics, copyrights and symbols associated with or referring to CDI [Churchill

Downs Incorporated], including those set forth on Appendix A and/or any attachments thereto." (*Id.* at § 1(a).) Appendix A lists the following Licensed Indicia: "Churchill Downs Incorporated," "Kentucky Derby," and "Kentucky Oaks." (*Id.* at App. A.) The License Agreement further requires that "[a]ny trademark or copyright registration obtained or applied for that contains the Licensed Indicia or any similar mark shall be immediately transferred to [plaintiff] without compensation." (*Id.* at § 7(a).) Finally, section 18 of the License Agreement explicitly states that section 7 "shall survive the termination or expiration of this Agreement." (*Id.* at § 18.)

Defendants contend that the Licensed Indicia are limited to those listed in Appendix A, and thus there is no breach of the Licensing Agreement in defendants' application for a trademark in "Louisville Jockey Club." (Defs.' Reply [79] at 8.) The clear language of the contract does not, however, limit Licensed Indicia to those in Appendix A. In the definition of "Licensed Indicia" and elsewhere in the contract, it is emphasized that the Indicia *include* those listed in Appendix A, thereby implying that there are Indicia *not* listed in Appendix A. Thus, under the only reasonable interpretation based on the plain, unambiguous terms of the contract, Appendix A lists only the subset of plaintiff's Licensed Indicia that defendants would hold a license to use, not the full extent of plaintiff's Licensed Indicia. Because of this, if "Louisville Jockey Club" qualifies as Licensed

31

Indicia or "similar mark" under the License Agreement, defendants have breached their post-termination obligations under the contract.

"Louisville Jockey Club" was the name of an early owner and operator of the Churchill Downs horse-racing grounds, of which plaintiff is the successor in interest. (Compl. [1] at ¶¶ 13 - 16.) The name has appeared in promotional materials for Churchill Downs and the Kentucky Derby at various times throughout its history. (Pl.'s Mot. for Summ. J. [72] at Exs. 28A and 46.) At least as recently as 1992, plaintiff's official Kentucky Derby program has featured historic images of Churchill Downs and the name "Louisville Jockey Club." (Pl.'s Mot. for Summ. J. [72] at Ex. 46.; PSMF [72] at ¶¶ 29-31.) As recently as 2008, plaintiff produced merchandise bearing the "Louisville Jockey Club" mark. (PSMF [72] at ¶ 30.) Defendants' own writings recognize the longstanding connection between the Louisville Jockey Club and the Kentucky Derby, describing its "Louisville Jockey Club Vintage Collection" as a "Derby product offering" and marketing it "to commemorate another running of this great Kentucky event." (Pl.'s Mot. for Summ. J. [72] at Ex. 37A.) Thus, the Court finds "Louisville Jockey Club" to be Licensed Indicia of plaintiff under the Licensing Agreement, as it is among the "trademarks...associated with or referring to CDI." (Compl. [1] at Ex. 1, § 1(a).) Defendants' trademark application in this name breaches its post-termination obligations under the Licensing Agreement.

32

<u>**CONCLUSION**</u>

This Court holds that defendants have infringed upon plaintiff's trademarks in violation of section 32(1) of the Lanham Act and breached the Licensing Agreement in seeking to trademark "Louisville Jockey Club." The Court thereby **GRANTS** plaintiff's motion for partial summary judgment [72] and for the same reasons **DENIES** defendants' motion for summary judgment [67]. The Court further **DENIES as moot** plaintiff's motion for preliminary injunction [22], **DENIES as moot** plaintiff's motion to supplement amended motion for preliminary injunction [38], **DENIES** defendants' motion for leave to file amended answer and counterclaim [40], **DENIES as moot** defendants' motion to compel [43], and **DENIES as moot** defendants' motion for extension of time to complete discovery [60].

The Court orders plaintiff to confer with defendants and thereafter to submit a draft order for a permanent injunction by **October 28, 2013.** Plaintiff shall also submit a brief on damages by the above deadline. Defendants shall respond by **November 27, 2013.** Plaintiff's reply will be due by **December 13, 2013.**

SO ORDERED, this 23rd day of September, 2013.


/s/ Julie E. Carnes
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

33