IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHURCHILL DOWNS INC.,

    Plaintiff,

v.

COMMEMORATIVE DERBY PROMOTIONS,
INC. and LEONARD LUSKY,

    Defendants.

CIVIL ACTION NO.

1:12-cv-517-JEC

## ORDER & OPINION

This matter is before the Court on defendants' Motion for Reconsideration and Clarification [86] of the Court's previous Order [85]. The Court has reviewed the record and the parties' arguments, and **GRANTS in part** and **DENIES in part** defendants' Motion for Reconsideration and Clarification [86].

## BACKGROUND

This case arises out of a trademark and licensing dispute.[1] Plaintiff is the proprietor of the Churchill Downs racetrack and the Kentucky Derby and Kentucky Oaks races. Plaintiff holds various trademarks associated with those. Defendants have long been involved in marketing horse-racing memorabilia. On September 23, 2013, this

---

[1] The details of the dispute can be found in the Order. (*See* Order [85] at pp. 2-4.)

Court considered both parties' motions for summary judgment, granting plaintiff's and denying defendants'. (*See* Order [85].)  Over three weeks later, on October 18, 2013, defendants filed an untimely Motion to Reconsider and Clarify the Order [86].[2]  Plaintiffs filed a Memorandum in Opposition [92].  Defendants filed a Reply [93].

## MOTION FOR RECONSIDERATION

### I. MOTION FOR RECONSIDERATION STANDARD

Local Rule 7.2(E) authorizes a motion for reconsideration when "absolutely necessary."  N.D. Ga. R. 7.2(E).  "Reconsideration is only 'absolutely necessary' where there is: 1) newly discovered evidence; 2) an intervening development or change in controlling law; or 3) a need to correct a clear error of law or fact." *Bryan v. Murphy*, 246 F.Supp. 2d 1256, 1258-59 (N.D. Ga. 2003)(Martin, J.)(citations omitted).  A motion for reconsideration is not an appropriate mechanism to set forth new theories of law, or introduce new evidence, unless the evidence was previously unavailable. *Mays v. U.S. Postal Serv.*, 122 F.3d 43, 46 (11th Cir. 1997).  Likewise, parties cannot use a motion for reconsideration to "relitigate old matters" or "raise argument[s] . . . that could have been raised prior to the entry of judgment." *Linet v. Vill. of Wellington*, 408

---

[2] Local Rule 7.2(E) states, in relevant part, that "the motion shall be filed with the clerk of court within ten (10) days after entry of the order or judgment."

2

F.3d 757, 763 (11th Cir. 2005). *See also, Mincey v. Head*, 206 F.3d 1106, 1137 (11th Cir. 2000)(noting that the function of a motion for reconsideration is not "to give the moving party another 'bite at the apple'").

Here, defendants base their motion for reconsideration on the grounds that the Court made errors of law or fact in its previous Order.  These are addressed below.

## II. "LOUISVILLE JOCKEY CLUB" ISSUES

In the Order, the Court held that plaintiff has a common law trademark in "Louisville Jockey Club," a former name of the Churchill Downs racetrack, based on plaintiff's long history of use of the mark in its promotional materials and merchandise. (Order [85] at p. 13.) The Court further held that the License Agreement required defendants to transfer their registration of "Louisville Jockey Club" to plaintiff. (*Id.* at pp. 31-32.) Defendants raise objections to both of these holdings.

### A.     Plaintiff's Trademark in "Louisville Jockey Club"

Defendants argue that the Court erred in holding that plaintiff's history of use of "Louisville Jockey Club" in its merchandise and advertising material was sufficient to give rise to a common law trademark.  In support of this, defendants reiterate arguments from their earlier briefs that plaintiff has not used "Louisville Jockey Club" in a commercial manner.  Alternatively, and

3

more persuasively, defendants contend that even if plaintiff once had a trademark in "Louisville Jockey Club" and has used it commercially, that trademark has been lost to abandonment due to long gaps in that history of commercial use.

Under the Lanham Act, a formerly valid trademark may be considered abandoned:

> [w]hen [the mark's] use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. 'Use' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

15 U.S.C. § 1127. Abandonment thus requires both non-use and a lack of intent to resume commercial use of the mark. *Sheila's Shine Products, Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 124 (5th Cir. 1973)("[M]ere non-use for a period of time is insufficient to constitute abandonment of a mark.  Rather, an intent to abandon the mark must also be evident.")(citations removed).[3]  In *AmBrit*, the Eleventh Circuit held that a mark was abandoned because of the length of time involved (48 years) and the fact that the mark owner had offered as evidence of its intent to resume commercial use only its renewal (twice) of the registration of the trademark. *AmBrit, Inc. v.*

---

[3] Decisions of the former Fifth Circuit rendered prior to October 1, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc).

4

*Kraft, Inc.*, 812 F.2d 1531, 1550-51 (11th Cir. 1986).

Even with plaintiff's documented uses of "Louisville Jockey Club," there are lengthy temporal lapses, such that the first prong of the abandonment test is satisfied.[4] This shifts to plaintiffs the burden of producing evidence of a continuing intent to make commercial use of the mark.  *Id.* at 1550.[5]  The Court finds that plaintiff has not responded to defendants' abandonment defense with sufficient evidence to rebut the presumption of abandonment raised by the lapse in use of the "Louisville Jockey Club" mark.[6]  Instead, plaintiff simply asserts that it "continues to make commercial use of Louisville Jockey Club as a reference to Churchill Downs." (Pl.'s Memo. in Opposition [92] at p. 20.)

---

[4] Defendants count five uses between 1938 and 2011.  (Defs.' Memo. in Supp. of Mot. for Recon. [86-1] at p. 7.)  Plaintiff provides no evidence of additional uses.

[5] However, the ultimate burden of proof remains with the party challenging the trademark-holder's rights. *Cumulus Media, Inc. v. Clear Channel Communications, Inc.*, 304 F.3d 1167, 1177 (11th Cir. 2002).

[6] Nor has plaintiff decided to raise arguments relating to abandonment, such as those involving modification or "tacking" of an older mark onto a newer one. *See, e.g., Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 955 (7th Cir. 1992)(not using the entire mark, but maintaining "key elements" of it, may be sufficient to avoid a determination of abandonment); *Van Dyne-Crotty, Inc. v. Wear-Guard Corp.*, 926 F.2d 1156, 1160 (Fed. Cir. 1991)("Tacking is occasionally permitted where the two marks, though differing slightly in their literal meaning or grammatical presentation, nevertheless possess the same connotation in context.")

AO 72A
(Rev.8/82)

Plaintiff also emphasizes that defendants' abandonment defense was not made prior to their present motion, and thus is an illicit "second bite at the apple." (*Id.* at p. 4.)  It is true that it takes some effort to find defendants' abandonment theory in the earlier briefs.  This Court can find the argument stated once, in defendants' motion for summary judgment: "Even if Plaintiff could somehow establish that it held a property right in the corporate names 'Louisville Jockey Club' and/or 'New Louisville Jockey Club' any such rights are no longer in effect due to Plaintiff's failure to use the marks for upwards of 80 years." (Defs.' Mot. for Summ. J. [67-1] at p. 20.)  There, defendants cited two cases, one of which makes no mention of abandonment, the other merely mentioning it in the course of a discussion of various defenses to trademark claims.  *See Galt House, Inc. v. Home Supply Co.*, 483 S.W.2d 107, 110 (Ky. 1972)(no mention of abandonment) and *Consumers Petroleum Co. v. Consumers Co. of Ill.*, 169 F.2d 153, 161-62 (7th Cir. 1948)(passing mention of abandonment defense).  Defendants did not there cite *AmBrit* in support of their abandonment argument, which is the case they now rely upon to support their abandonment defense.  Although defendants' efforts to make their abandonment argument were minimal, the Court cannot say that defendants did not raise the argument at all.

The Court thus **GRANTS** defendants motion to reconsider on this point, and modifies its Order to hold that plaintiff had abandoned

6

its trademark in "Louisville Jockey Club."

### B. "Louisville Jockey Club" and the License Agreement

As for the issue of whether the License Agreement prohibits defendants (or at least Commemorative Derby Promotions) from seeking registration of a trademark in "Louisville Jockey Club," defendants contend that because plaintiff does not have a trademark in "Louisville Jockey Club" and the term is not explicitly listed in the License Agreement as being among the "Licensed Indicia," defendants are not in breach of the License Agreement in seeking to register the mark.

The relevant portion of the License Agreement states that Commemorative Derby Promotions must "not, at any time, file a trademark application with the United States Patent and Trademark Office for the Licensed Indicia." (Compl. [1] at Ex. 1, § 7(a).) The License Agreement defines "Licensed Indicia" as "the designs, trademarks, service marks, logographics, copyrights and symbols associated with or referring to CDI, including those set forth in Appendix A and/or any attachments thereto." (*Id.* at § 1(a).) Because the Court now holds that plaintiff has abandoned its trademark in "Louisville Jockey Club," it follows that defendants are not in breach of the License Agreement in registering the "Louisville Jockey Club" mark.

The Court thus **GRANTS** defendants' motion to reconsider and now

7

holds that defendants did not breach the License Agreement in registering a trademark in "Louisville Jockey Club."

### III. <u>LUSKY AND THE LICENSE AGREEMENT</u>

Defendants contend that the Court erred in finding both Commemorative Derby Promotions and Lusky in violation of the License Agreement, on the grounds that only Commemorative Derby Promotions, was a party to the License Agreement.

The License Agreement is, in its terms, a contract between Churchill Downs, Inc. and Commemorative Derby Promotions. (*See* Compl. [1] at Ex. 1).  However, in the complaint, plaintiff alleged that Lusky at all times "has been the sole, or principal owner, officer and manager of CDP" and "has had the right and ability to supervise the actions complained of in each of the counts brought herein and actually directed, controlled and participated in as the moving force behind the actions complained of and has had direct financial interest in the proceeds of same." (Compl. [1] at ¶¶ 36-37.) Defendants admitted these allegations. (Ans. [17] at ¶ 4.)

Throughout the pleadings, plaintiff refers to "defendants" in its allegations of License Agreement breach.  For example, plaintiff refers to "licensed products also produced by Defendants." (Pl.'s St. of Mat. Facts [72-1] at ¶ 45.)  Only a licensee could produce a licensed product.  In its motion for summary judgement, plaintiff concludes that "[i]t is apparent Defendants . . . have further

8

violated the Churchill Downs License Agreement by applying for registration of the mark LOUISVILLE JOCKEY CLUB." (Pl.'s Memo. in Supp. of Mot. for Summ. J. [72-2] at p. 25.)  This indicates that plaintiff believed both defendants to be subject to the obligations of the License Agreement.

Defendants, for their part, give similar indications in their pleadings. Defendants write that "Article 2 of the License Agreement refers to the grant of license provided to the Defendants under the Agreement." (Defs.' Response to Pl.'s Mot. for Summ. J. [74] at p. 21.)  This suggests that Lusky personally held the license. Defendants elsewhere make similar representations:  "Churchill Downs was willing to enter into a license agreement with the Defendants," "[t]hroughout the term of the License Agreement, the Defendants were only notified of a problem with their merchandising involving Plaintiff's marks on a single occasion," and "Churchill Downs has never advised Defendants that the use of a historically accurate listing of the past Kentucky Derby winners in conjunction with Defendants' merchandise would or even could constitute a violation of the License Agreement." (*Id.* at pp. 4-5.) Defendants even refer to plaintiff "negotiating the License Agreement with the Defendants" (Defs.' St. of Mat. Facts [67-1] at ¶ 16.)  This language, which can be found throughout the record, suggest that defendants also understood the License Agreement's obligations to extend to Lusky.

9

However, because the Court now holds that there was no breach of the License Agreement, the issue of whether defendant Lusky is a party to the License Agreement is **MOOT**.

**IV.   "JULEP CONDITION"**

In the Order, the Court noted in its analysis of the trademark dispute that:

> defendants' marks are sometimes only slight modifications of the marks it used previously under its License Agreement with the plaintiff.  For example, one of the licensed products included an image of a mint julep with the words 'Mint Condition at the Kentucky Derby.'  After the expiration of the License Agreement, Defendants produced a shirt with a nearly identical image of a mint julep accompanied by the words 'Julep Condition.'

(Order [85] at p. 21.)  The Court held that the "Julep Condition" shirt, despite its revisions, conveyed the same reference to the Kentucky Derby as that of the licensed shirt.  This was further supported by the fact that the shirts are sold during Derby season alongside more explicitly Derby-related items. Defendants, however, object to the inclusion of "Julep Condition" among the marks the Court held to violate plaintiff's marks on the grounds that "[t]he 'Julep Condition' shirt contains no reference to the Kentucky Derby or even to horses, and Plaintiff has no trademark rights in the term 'mint julep' or 'mint condition.'" (Defs.' Memo. in Supp. of Mot. for Recon. [86-1] at p. 20.)

The Court relied in part on the reasoning in two out-of-circuit

10

cases with similar facts. *See Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22 (1st Cir. 1989) and *Bd. of Supervisors for Louisiana State Univ. Agric. and Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465 (5th Cir. 2008). These cases involved defendants that made apparel that, without using the exact trademarks of plaintiffs, exhibited design elements and were marketed in ways that were likely to produce confusion in the public. *See Boston Athletic Ass'n*, 867 F.2d at 28 ("Defendants are using the Boston Marathon sponsored and operated by the BAA to promote the sale of goods which are adorned so as to capitalize on the race.") and *Smack Apparel*, 550 F.3d at 473 ("Smack's products are similar to and competed with goods sold or licensed by the Universities and are sold directly alongside merchandise authorized by the plaintiffs at or near events referenced in the shirts.") Those Courts held that the defendants had infringed the plaintiffs' marks.

In *Boston Athletic Ass'n*, the defendant apparel company produced licensed shirts for the plaintiff, the proprietor of the Boston Marathon. 867 F.2d at 25. After that license expired and the plaintiff licensed another party to produce its Boston Marathon apparel, defendant continued to sell similar apparel that, although avoiding explicit reference to the Boston Marathon, contained elements that together, and in the context in which they were marketed, clearly referred to the Boston Marathon. *Id.* For example,

11

in one t-shirt, the defendant dropped "Boston" from the name "Boston Marathon," but included images of runners (an obvious reference to a competitive race) and the words "Hopkinton-Boston" (which denote the beginning and end points of the Boston Marathon). *Id.* at 29. The shirts were sold in the vicinity of the Marathon, adding further contextual confirmation of the reference. The First Circuit rejected "[t]he district court's holding that plaintiff's rights did not sweep any further than their actual marks" as "not a correct application of trademark law." *Id.* at 29-30. Instead, it based its finding of infringement on the fact that, despite the superficial differences, "the meaning of the two marks is more than similar, it is identical." *Id.* at 30. The Court concluded:

> There can be no doubt that the language and design on defendant's shirts intentionally calls attention to an event that has long been sponsored and supported by the BAA–an event that is, in fact, the subject of its registered mark. Defendant's shirts are clearly designed to take advantage of the Boston Marathon and to benefit from the good will associated with its promotion by plaintiffs. Defendants thus obtain a 'free ride' at plaintiff's expense.

*Boston Athletic Ass'n*, 867 F.2d at 33.

Here, as was the case in *Boston Athletic Ass'n*, the licensed "Mint Condition at the Kentucky Derby" shirt gains its meaning through the combination of text, image, and basic historical association. Defendants, with their "Julep Condition" shirt, try to avoid violating plaintiff's trademark rights by dropping the term

12

"Kentucky Derby," while leaving the meaning and reference of the shirt unchanged.  Clearly, however, the shirt only "works" as long as the buying public understands it as Kentucky Derby memorabilia.

Although the parallels with *Boston Athletic Ass'n* are obvious, the Court, upon reconsideration, finds the defendants have as a factual matter made somewhat more extensive modifications to the mark for their "Julep Condition" shirt than had the defendant in *Boston Athletic Ass'n*.  Where the defendant in *Boston Athletic Ass'n* retained the words of the plaintiff's marks ("Boston" and "Marathon"), defendants here have removed all direct textual reference to "Kentucky Derby."  Although, in the context of horse-racing memorabilia sold in the vicinity of Louisville around the time that the Kentucky Derby is held, the "Julep Condition" shirt conveys a clear reference to the Kentucky Derby, the mint julep cocktail is not itself a trademark held by plaintiff.  There is, therefore, an extra step involved in this case that was not present in *Boston Athletic Ass'n*, in that one has to make the final leap from "mint julep" to "Kentucky Derby," rather than just from "marathon in Boston" to "Boston Marathon."  The matter is close, but the Court now holds that the "Julep Condition" mark does not cross the line of infringement.

The Court **GRANTS** defendants' motion to reconsider, and modifies the Order to hold that defendants' "Julep Condition" mark does not

13

infringe plaintiff's marks.

**V.    DEFENDANTS' INTENT TO INFRINGE**

Defendants contend that the Court was incorrect in finding an intent to infringe on plaintiff's marks. Defendants state that they "believed in good faith that they could use terms that could be associated with the Kentucky Derby as long as they did not use Plaintiff's marks on their products based on the License Agreement and their communications with Plaintiff relating to the Agreement." (Defs'. Memo. in Supp. of Mot. to Recon. [86-1] at p. 24.) Further, Defendants contend that "the issues of this case are novel to the Eleventh Circuit." (*Id.* at pp. 24-25.) Faced with similar facts, the Fifth Circuit in *Smack Apparel* declined to find an intent sufficient to justify attorney's fees. (*Id.* at p. 24)(citing *Smack Apparel*, 550 F.3d at 491.)

In the Order, the Court discussed defendants' "intent to misappropriate the good will" of plaintiff in the context of the "likelihood of confusion" test. (*See* Order [85] at pp. 24-26.) The Court found such intent in, for example, defendants' labeling "some of their products as 'authentic' or 'official' Derby items, indicating an intent to lead consumers to believe there was an association with the Kentucky Derby." (*Id.* at p. 25.) The Court also noted defendants' characterization of their merchandise as "officially licensed Kentucky Derby products." (*Id.* at p. 24.) The

14

Court held that defendants did demonstrate an intent to misappropriate the good will of plaintiff, and that this lent support to finding a likelihood of confusion. (*Id.* at pp. 25-26.) Further, defendants, on account of the prior License Agreement with plaintiff, were well aware of plaintiff's trademarks. The Court thus finds no error in its determination.

The Court did not, however, give any indication in the Order as to whether the facts that supported a finding of an intent to misappropriate the good will of plaintiff would also suffice to support an award of attorney's fees under the Lanham Act, which permits such recovery "in exceptional cases." 15 U.S.C. § 1117(a). The Eleventh Circuit has held that such fees "should be awarded only if there was evidence of fraud or bad faith." *Welding Services, Inc. v. Forman*, 301 Fed.Appx. 862, 863 (11th Cir. 2008). "Even if the trial court finds that the circumstances of the case are, in fact, exceptional, the decision whether to award attorney's fees is still discretionary." *Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 329 (11th Cir. 1989). This clearly involves an analysis of factors beyond those the Court was required to consider in applying the likelihood of confusion test to determine if there was trademark infringement. As the parties are still briefing on the issue of damages, the Court declines to decide whether this is an exceptional case under 15 U.S.C. § 1117(a).

15

The Court therefore **DENIES** defendants' motion to reconsider its finding of an intent to infringe.

## VI. CLARIFICATION OF WHICH PRODUCTS INFRINGE WHICH TRADEMARKS

Defendants further request that the Court specify in greater detail the bases for finding that defendants' products infringe plaintiff's marks.  The Court has provided, in the Order, the grounds upon which defendants' products infringe upon plaintiff's marks, and will not present an itemized list at this point.  Instead, the Court will address defendants' concerns when it turns its attention to the permanent injunction.

The Court **DENIES** defendants' motion to clarify.

### CONCLUSION

Based on the above, the Court **GRANTS in part** and **DENIES in part** defendants' motion for reconsideration and clarification.

So Ordered, this 7th day of August, 2014.

/s/ Julie E. Carnes
JULIE E. CARNES
Circuit Judge, sitting by
designation as District Judge

AO 72A
(Rev.8/82)